**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| ADAPTIVE CLASSIFICATION TECHNOLOGIES LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> KLDISCOVERY ONTRACK, LLC, <br><br> *Defendant.* | Civil Action No. 1:25-01802 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Adaptive Classification Technologies LLC ("ACT" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent No. 10,445,374 (the "'374 patent" or the "patent-in-suit"). Defendant KLDiscovery Ontrack, LLC ("KLDiscovery" or "Defendant") infringes the patent-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

## THE PARTIES

1.     ACT is a Texas limited liability company having its principal place of business at 121 Frederick St., Austin, TX 78704.

2.     Upon information and belief, KLDiscovery is a corporation organized and existing under the laws of Delaware with its principal place of business at 9023 Columbine Road, Eden Prairie, MN 55347. KLDiscovery can be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

3.     This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

1

4.      This Court has specific personal jurisdiction over KLDiscovery pursuant to due process and/or the Texas Long Arm Statute. KLDiscovery has sufficient minimum contacts with the forum because, inter alia, (i) KLDiscovery has done and continues to conduct business in Texas including in this District, (ii) KLDiscovery has a regular and established place of business in this District, and (iii) KLDiscovery has, directly and through intermediaries, committed and continues to commit acts of patent infringement in Texas including in this District. Moreover, KLDiscovery actively directs its activities to customers located in the State of Texas and this District.

5.      Venue is proper in this district under 28 U.S.C. § 1400(b).  Defendant KLDiscovery is registered to do business in Texas, has an office in the Western District of Texas at 9500 Arboretum Blvd., Suite L2-120, Austin, TX 78759, has transacted business in the Western District of Texas, and has committed acts of direct and indirect infringement in the Western District of Texas.

## THE INVENTORS

6.      The inventors of the '374 patent are Dr. Gordon V. Cormack and Dr. Maura R. Grossman. Each played a pivotal role in the creation and reduction to practice of the patented technology claimed in the '374 patent.

7.      Dr. Gordon V. Cormack earned his B.Sc., M.Sc., and Ph.D. in computer science from the University of Manitoba in 1977, 1978, and 1981, respectively. After graduating, Dr. Cormack taught at McGill University before joining the University of Waterloo in 1983. These educational experiences provided the scholarly foundation for his pioneering work in compression, search, and e-discovery.

8.      Over a four-decade career, Dr. Cormack has published more than 100 peer-reviewed papers and co-authored the graduate textbook Information Retrieval: Implementing and Evaluating Search Engines (MIT Press, 2010). Among his most acclaimed papers is his 2008 paper titled "Novelty and Diversity in Information Retrieval Evaluation,"

2

which received the 2019 ACM SIGIR (Special Interest Group on Information Retrieval) Test-of-Time Award.

9.      Dr. Cormack has shaped benchmark-setting initiatives as a long-time program-committee member of NIST's Text Retrieval Conference, coordinating the Spam (2005–07), Legal (2010–11), and Total Recall (2015–16) tracks, and he served as president of the Conference on Email and Anti-Spam.

10.     In addition to advancing the research field and the state of the art, Dr. Cormack also helped guide the next generation of innovators. For over a decade, Dr. Cormack coached the University of Waterloo's ACM International Collegiate Programming Contest teams, guiding them to the World Finals every year of his tenure and helping them capture the World Championship in 1999 (along with North American titles in 1998 and 2000).

11.     Dr. Cormack is the co-inventor of both Dynamic Markov Compression (DMC) and Continuous Active Learning® (CAL®). His and Dr. Grossman's research on technology-assisted review has been cited by courts in the United States, Ireland, and the United Kingdom when approving predictive-coding workflows.

12.     Dr. Cormack is currently professor emeritus at the David R. Cheriton School of Computer Science at the University of Waterloo and continues to actively consult in the fields of machine learning and AI-assisted review.

13.     Dr. Maura R. Grossman, Dr. Cormack's peer and co-inventor, is a research professor at the University of Waterloo's Cheriton School of Computer Science, cross-appointed to the School of Public Health Sciences, and the principal of her own consulting business. She also holds an adjunct post at Osgoode Hall Law School and has taught e-discovery at Columbia and Georgetown.

14.     Dr. Grossman earned an A.B., magna cum laude, from Brown University, followed by her M.A. and Ph.D. in Psychology from the Gordon F. Derner Institute of Advanced Psychological Studies at Adelphi University. She later obtained her J.D., magna cum laude and Order of the Coif, from Georgetown University Law Center, where she served as Executive

Notes & Comments Editor of the Georgetown Law Journal. These multidisciplinary credentials—combined with her research professorship in computer science—laid the foundation for her pioneering contributions to technology-assisted review and electronic discovery.

15.    For seventeen years, Dr. Grossman was Of Counsel at Wachtell, Lipton, Rosen & Katz, where she led e-discovery and information-governance strategy for Fortune 100 clients.

16.    Dr. Grossman's landmark 2011 article "Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient than Exhaustive Manual Review," co-authored with Dr. Cormack, is a canonical guide for technology-assisted review, providing empirical proof that predictive coding can outperform manual review. It is now a staple citation in judicial opinions worldwide.

17.    Courts frequently appoint Dr. Grossman as a special master or discovery expert—most notably in the Southern District of New York—to design and monitor TAR protocols, and she co-led NIST's TREC Legal (2010–11) and Total Recall (2015–16) tracks, setting industry benchmarks.

18.    Like Dr. Cormack, Dr. Grossman also played a pivotal role in guiding the next generation of innovators. In 2019, she was named Director of Women in Computer Science at Waterloo, and she taught the interdisciplinary course "Artificial Intelligence: Law, Ethics, and Policy."

19.    Dr. Grossman has received numerous awards for her scholarship and contributions to the field, including the American Bar Association's 2016 "Legal Rebel" designation, inclusion in the 2017 Fastcase 50 list of legal innovators, and recognition by Who's Who Legal (2020) as a National and Global e-Discovery Leader.

20.    In addition to the above accolades, Dr. Cormack and Dr. Grossman are named inventors on almost a dozen patents (the "Cormack/Grossman patents") in the fields of machine learning, technology-assisted document review, and active document processing.

4

21.     These patents have been cited in hundreds of U.S. patents and published patent applications as prior art before the United States Patent and Trademark Office. Companies whose patents cite the Cormack/Grossman patents include:

- Microsoft Corporation
- Open Text Corporation
- International Business Machines Corporation
- Nuix North America
- Canon Inc.
- Ford Motor Company
- Oracle Corporation
- SAP SE
- AT&T Inc.
- Fujitsu Limited
- Xerox Corporation
- Kyocera Corporation
- Nokia Corporation
- Relativity ODA LLC
- Bank of America Corporation

## TECHNOLOGY BACKGROUND

22.     Electronic discovery ("e-discovery") traces its roots to early efforts to process computer-generated evidence in the 1960s. The modern era began when full-text retrieval systems—such as Concordance—debuted in mid-1980s, allowing lawyers to keyword-search digital pages rather than flip through boxes of paper records.

23.     Early milestones include the 1970 amendment to Federal Rule 34 authorizing discovery of "electronic data compilations," and the creation of the Electronic Discovery Reference Model (EDRM) in 2005, which described the now-familiar stages of preservation, processing, review, and production.

24.     By the late 1990s, everyday email use and network backups had multiplied data volumes, setting the stage for Judge Shira Scheindlin's *Zubulake* rulings (2003–2005). *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004). Those decisions underscored that litigants must preserve and produce relevant digital documents, including email, even when

they reside on difficult-to-restore backup tapes—highlighting the need for software that could search, de-duplicate, and review massive collections defensibly.

25.     The 2006 amendments to the Federal Rules of Civil Procedure expressly addressed e-discovery, defining "electronically stored information" ("ESI") in Rules 16, 26, 33, 34, 37, and 45 and introducing Rule 26(b)(2)(B), which excuses production of ESI that is "not reasonably accessible because of undue burden or cost." Those amendments helped drive demand for review platforms—such as Concordance, Summation, IPRO, and early versions of Relativity—that converted native files to TIFF images, paired them with load files, and drove attorney review through static keyword hit lists.

26.     While those systems were sufficient for their time, they were quickly overwhelmed by the volume of data expected to be processed and reviewed.

27.     From the mid-1980s to the early 2000s, the cost to store data fell by orders of magnitude, and corporate data volumes increased commensurately—making purely linear keyword review untenable or, at best, unreasonably expensive for many matters.

28.     Vendors introduced concept-clustering, near-duplicate detection, and email threading. Yet reviewers still had to craft broad search strings and perform manual quality control, leaving many responsive documents undiscovered and review costs spiraling. These pressures led to experimentation with machine-learning techniques to classify documents more efficiently—the seeds of technology-assisted review ("TAR").

29.     In 2011, Dr. Maura R. Grossman and Dr. Gordon V. Cormack published research demonstrating that supervised learning could achieve higher recall than exhaustive manual review at a fraction of the effort. Within a year, Magistrate Judge Andrew Peck cited that research in *Da Silva Moore v. Publicis Groupe*—an early federal opinion approving "predictive coding." See 287 F.R.D. 182 (S.D.N.Y. 2012).

30.     Early "TAR 1.0" implementations commonly used sizeable seed sets, staged training rounds, and often employed curated control samples to measure recall. In such workflows, a model would be trained on an initial set of documents, then applied to remaining

documents in the collection; models were typically updated only after additional rounds of training.

31.     Commentators later contrasted TAR 1.0 with TAR 2.0 methods that provided more flexible, continuous learning.

32.     In 2014–2015, Drs. Cormack and Grossman introduced Continuous Active Learning® (CAL®)—a protocol that retrains as coding progresses and dynamically re-ranks the corpus. Peer-reviewed evaluations beginning with the SIGIR study—and extended in follow-up work—reported efficient, high-recall results using continuous learning.[1]

33.     CAL®'s reported effectiveness spurred rapid commercial adoption. Major platforms introduced continuous-learning capabilities, and cloud-based tools highlighted speed and machine-learning-driven culling as key advantages.

34.     In 2019, industry bodies such as EDRM published TAR guidelines recognizing continuous-learning approaches, including CAL®, as widely accepted for high-recall workflows.

35.     Today, TAR platforms often layer continuous learning with concept analytics, communication mapping, and (increasingly) summarization tools, enabling counsel to interrogate large digital repositories efficiently.

36.     KLDiscovery and its predecessors (including Kroll Ontrack) have actively sought U.S. patent protection for technology used in the KLDiscovery eDiscovery Platform and related e-discovery solutions. KLDiscovery publicly reports multiple issued Nebula-related patents in recent years, reflecting the company's view that these technologies are patentable and commercially significant.

37.     Further, at least one KLDiscovery/Kroll Ontrack patent family cites foundational work by Dr. Gordon V. Cormack and collaborators on technology-assisted review. For example, the Kroll Ontrack application titled *Electronic Review of Documents* (which matured into U.S. Patent No. 9,269,053 B2) lists a non-patent citation to "Cormack, Gordon V., et al., *Overview of*

---

[1] CAL® is often referred to as TAR 2.0.

*the TREC 2010 Legal Track*." This demonstrates KLDiscovery's awareness of the field-defining research underlying the '374 patent.

## THE PATENT-IN-SUIT - U.S. PATENT NO. 10,445,374

38.     U.S. Patent No. 10,445,374, entitled "Systems and Methods for Conducting and Terminating a Technology-Assisted Review," was filed on June 17, 2016 and claims priority to June 19, 2015. The '374 Patent is valid and enforceable. A true and correct copy of the '374 Patent is attached hereto as Exhibit A.

39.     The '374 Patent discloses systems and methods for determining when to terminate a classification process such that classifiers generated during iterations of the classification process accurately classify documents in a collection (e.g., as relevant or non-relevant) and achieve high quality "within a certain level of assurance," i.e., high reliability. Ex. A, 4:8–17.

40.     The '374 Patent addresses modern ESI scale by beginning with a reviewer-identified target set (T). As the specification explains:

> "In step **1020**, relevant documents are identified in a document collection to create a target set T. Following or during identification of the target set T, an indication of the documents in the target set T may be received. In certain embodiments, documents in T are identified by selecting documents at random from the document collection, presenting the document to one or more reviewers, and then adding the document to the set T if the reviewer indicates the document is 'relevant.'"

Ex. A, 6:63-7:14

41.     Once the target set T exists, the '374 Patent directs the machine to "execute the classification process that enables training of a classifier using documents in the target set …." Ex. A, 18:33–34.

42.     The patent then specifies that the classification process "utilize[s] a second iterative search strategy which does not distinguish between documents in the target set and documents in the document collection to classify documents in the document collection." Ex. A, 18:35–39. Consistent with this language, the invention teaches a membership-agnostic

classification step: the classifier applies a uniform decision rule across the collection, rather than using target-set membership as a factor in how documents are classified.

43.    While the specification does not limit the second strategy to any single implementation, it expressly contemplates that it may be "a TAR process" and, in particular, "a CAL approach which retrieves and/or classifies the most likely relevant documents from the collection." Ex. A, 7:26–29.

44.    Finally, the '374 Patent requires that the workflow "terminate the classification process based upon a comparison between the results of the second search strategy and a characteristic of the target set … wherein the classification process achieves a target level of recall with a certain probability upon termination." Ex. A, 18:40–45.



*See, e.g.*, Ex. A, FIG. 1.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 10,445,374

45.     The preceding paragraphs are reincorporated by reference as if fully set forth herein.

46.     The '374 patent is valid and enforceable.

47.     ACT is the owner and assignee of all rights, title, and interest in the '374 patent, including the rights to grant licenses, to exclude others, and to recover past damages for infringement of that patent.

48.     Upon information and belief, KLDiscovery designs, makes, uses, sells, imports and/or offers for sale in the United States the KLDiscovery Nebula eDiscovery Platform (the "Accused Instrumentality" or "the KLDiscovery eDiscovery Platform").

49.      Upon information and belief, KLDiscovery's eDiscovery Platform comprises a technology-assisted review system that uses machine learning (including Prioritized Review/CAL) to classify documents and finish review using predictive-coding thresholds. KLDiscovery markets its Predictive Coding & Advanced Text Analytics as "award-winning, patented technology" that supports TAR workflows, including CAL/TAR 2.0. *See, e.g.,*



## Predictive Coding & Advanced Text Analytics

Our award-winning, patented technology, Nebula AI, provides best-in-class solutions for Technology Assisted Review (TAR) with relational analysis of unstructured data, including Email Threading & Near-Duplicate Detection. Nebula Predictive Coding utilizes true machine learning and supports all workflow strategies including Prioritized Review ("CAL", "TAR 1.0/2.0", etc.).

https://www.kldiscovery.com/solutions/nebula

50.     Upon information and belief, the KLDiscovery eDiscovery Platform comprises at least one computing device having a processor and physical memory, the physical memory that stores instructions.

51.    Upon information and belief, KLDiscovery's eDiscovery Platform includes instructions that, when executed, cause the system to receive an identification of a target set of documents in a collection—namely, documents identified as relevant by reviewers during an initial search-and-review step—and to store those reviewer-applied tags in the case database for use in later predictive-coding steps. For example, KLDiscovery's Create Coding Profile workflow directs users to begin with a random sample or a partially coded set, and it emphasizes that "predictive coding requires documents to be coded on an individual basis." KLDiscovery then leverages these reviewer coding decisions in subsequent predictive-coding operations. *See, e.g.*,

---

### Predictive Coding

Predictive Coding leverages reviewer coding decisions across a document collection to create a model for all documents. This is represented as a score, or ranking, between 0 and 100 for all documents. As reviewers code documents in Review, predictive coding analyzes the documents, generates scores, and prioritizes the remaining documents for review based on similar attributes using Continuous Active Learning (CAL) in terms of likelihood of responsiveness.

With predictive coding, you can:

- Increase the priority of responsive documents.

- Decrease the priority of non-responsive documents.

- Review the documents until reaching a zero percent responsiveness rate.

Predictive coding uses persistent indexing to reduce the processing time required for training and classifying sessions. Indexing automatically occurs in new predictive coding projects when documents are added from the Reviewer Document List, as well as when additional documents are added to an existing predictive coding project.

---

https://nebulahelp.ediscovery.com/content/Topics/Review/Createprofile.htm

## Predictive Coding Workflow

Create a predictive coding workflow to index, seed, and train documents. The workflow of predictive coding is as follows:

1. Create a predictive coding project (the container for the document set, the index field choices, and the classifiers used to create the predictive coding index).

   *Note: Multiple coding profiles can be created for a single project, and coding profiles can be applied across multiple projects.*

2. Create a seed set of documents within the document set that predictive coding can learn from by either:

   a. Selecting a random document set and begin an initial review

      -or-

   b. Selecting a partially coded document set where the coding adhered to the four corners rule of contract law.

   *Note: Predictive coding requires documents to be coded on an individual basis, not using family or email threading coding decisions.*

3. Continue reviewing a document set selected as a batch or part of workflow.

4. Run a training session to generate scores for the documents in the coding profile document set (both coded and uncoded).

https://nebulahelp.ediscovery.com/content/Topics/Review/Predcode.htm

52.     Upon information and belief, KLDiscovery's eDiscovery Platform executes a classification process that trains a classifier using reviewer-identified target-set documents and then—via a continuous active-learning (Train & Classify) loop—applies that classifier uniformly across the document collection to assign prediction scores and classify both coded and uncoded documents, without using target-set membership as a factor in the classification. *See, e.g.*,



https://nebulahelp.ediscovery.com/content/Topics/Review/PCSetup.htm#runtrain

## Predictive Coding Workflow

Create a predictive coding workflow to index, seed, and train documents. The workflow of predictive coding is as follows:

1. Create a predictive coding project (the container for the document set, the index field choices, and the classifiers used to create the predictive coding index).

   *Note: Multiple coding profiles can be created for a single project, and coding profiles can be applied across multiple projects.*

2. Create a seed set of documents within the document set that predictive coding can learn from by either:

   a. Selecting a random document set and begin an initial review

      -or-

   b. Selecting a partially coded document set where the coding adhered to the four corners rule of contract law.

   *Note: Predictive coding requires documents to be coded on an individual basis, not using family or email threading coding decisions.*

3. Continue reviewing a document set selected as a batch or part of workflow.

4. Run a training session to generate scores for the documents in the coding profile document set (both coded and uncoded).

https://nebulahelp.ediscovery.com/content/Topics/Review/Createprofile.htm

53.     Upon information and belief, KLDiscovery terminates the classification process when a score cutoff—tested on the Control-Set Performance section's Score Thresholds and reported in the Score Threshold Report—meets the recall objective for the predictive tag at the user-selected confidence level and margin of error, with "recall" defined by KLDiscovery as the proportion of True Positives to all documents marked positive by manual review (actual positives), thereby achieving a target level of recall with a certain probability upon termination. *See, e.g.,*



## Using Control Sets

Control Sets enable you to check the model quality and view the results of the predictive coding as a graph in the Performance section based on the current Priority Classifier.

The Performance section graph displays the following metrics:

- **Recall**: The proportion of True Positive documents (positive basing on PC score per given threshold AND manual review) to all documents marked as positive by manual review (actual positives).

- **Precision**: A proportion of True Positive documents to all documents that are positive per given threshold basing on PC service scores.

- **F1**: The harmonic mean of Precision and Recall.

The Score Threshold Report contains the score threshold and the number of documents above that threshold value in the document set, as well as the number of True Positives, True Negatives, False Positives, False Negatives and other performance metrics.

*To download an XLSX Score Threshold Report (XLSX file), click the Download Score Threshold Report icon.*

| | Score Threshold | CS - True Positives | CS - True Negatives | CS - False Positives | CS - False Negatives | Recall | Precision | F-Measure | Documents Above Threshold | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 99 | 3 | 138 | 1 | 135 | 2% | 75% | 3% | 8 | |
| 3 | 98 | 3 | 136 | 3 | 135 | 2% | 50% | 3% | 13 | |
| 4 | 97 | 5 | 136 | 3 | 132 | 3% | 62% | 5% | 19 | |
| 5 | 96 | 6 | 136 | 3 | 132 | 4% | 66% | 7% | 28 | |
| 6 | 95 | 6 | 136 | 3 | 130 | 4% | 66% | 7% | 31 | |
| 7 | 94 | 8 | 136 | 3 | 129 | 5% | 72% | 9% | 37 | |
| 8 | 93 | 9 | 136 | 3 | 129 | 60% | 75% | 11% | 40 | |
| 9 | 92 | 9 | 136 | 3 | 129 | 6% | 75% | 11% | 43 | |
| 10 | 91 | 9 | 135 | 4 | 129 | 6% | 69% | 11% | 55 | |
| 11 | 90 | 9 | 135 | 4 | 429 | 6% | 69% | 11% | 62 | |
| 12 | 89 | 12 | 133 | 6 | 126 | 8% | 66% | 14% | 80 | |
| 13 | 88 | 15 | 133 | 6 | 123 | 10% | 71% | 17% | 103 | |
| 14 | 87 | 18 | 132 | 7 | 120 | 13% | 72% | 22% | 124 | |
| 15 | 86 | 18 | 132 | 7 | 120 | 13% | 72% | 22% | 128 | |

Score Threshold Report

https://nebulahelp.ediscovery.com/content/Topics/Review/PCSetup.htm

## Prioritized Review (aka CAL)

Prioritized Review (aka CAL) is becoming a very popular predictive coding workflow in eDiscovery. Its simplicity and very low learning curve essentially eliminates the barrier to entry often encountered with SME Training. Prioritized Review is very popular in scenarios where there is a desire or requirement to put human eyes on all or most documents at issue in a case. This is occasionally referred to as TAR 2.0 since it is a more recently adopted workflow.

| PROS | CONS |
| --- | --- |
| ▪ Escalates important documents very rapidly and keeps irrelevant documents at bay; | ▪ Potential for cost savings is reduced compared to SME Training; |
| ▪ Is the most efficient way to organize a human review of any data set, assuming that data set needs at least some amount of human review; | ▪ The nature of legal review often requires that "families" (emails with attachments) be reviewed together, which inevitably interferes with a purely prioritized review; |
| ▪ Can be used more effectively on multiple issues simultaneously than SME Training; | ▪ Validation is strongly recommend if review stops before all documents are reviewed, which introduces SME burden to the workflow; |
| ▪ Enables even small review teams to be extremely productive; | |
| ▪ Almost no barrier to entry - any legal team can take advantage at any time. | |



| Training | Process | Validation |
| --- | --- | --- |
| The vast majority of training is simply the act of reviewing prioritized documents over time. The model is rebuilt at specified intervals to take advantage of new knowledge gained since the previous classification. Training usually commences with some combination of Active Learning, Random Sampling and seeds, but the impact of those samples diminishes as more documents are trained. | A legal team starts review and the system learns from human decisions when the model is built during specified intervals. The highest scoring documents are placed at the front of the review, so they get assigned earlier. The ratio of responsive documents to nonresponsive documents is tracked and reviewed (usually daily) to determine when relevant documents have been exhausted. Most teams stop review once the rate reaches a point where further review is not justifiable. | Validation is strongly recommended if a legal team decides to stop before all documents are reviewed. In this scenario, a random sample of all remaining documents should be taken, often referred to as the null set or elusion set, to confirm there is no significant percentage of relevant documents remaining. Validation passes when a strong proportionality (diminishing returns) argument can justify discarding the remaining documents. |

https://www.kldiscovery.com/docs/kld/pdf/bro-kld-us_mastering-predictive-coding-handbook_sep-2021.pdf



https://nebulahelp.ediscovery.com/content/Topics/Review/PCSetup.htm

54.    Upon information and belief, KLDiscovery has directly infringed and continues to directly infringe the '374 Patent by, among other things, making, using, selling, offering to sell, and/or importing in the United States the KLDiscovery eDiscovery Platform, during the term of the '374 Patent. See 35 U.S.C. § 271(a).

55.    Upon information and belief, by making, using, testing, offering for sale, importing, and/or selling the KLDiscovery eDiscovery Platform, KLDiscovery has injured ACT and is liable to ACT for directly infringing one or more claims of the '374 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a). The KLDiscovery eDiscovery Platform meets each and every limitation of at least claim 1 as alleged herein.

56.    Upon information and belief, KLDiscovery also indirectly infringes the '374 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

57.    KLDiscovery has had knowledge of the '374 patent since at least July 14, 2025, when it received a letter identifying the '374 patent and notifying it of its infringement.

58.    Upon information and belief, KLDiscovery intended to cause and has caused infringement by third-party customers and users of its KLDiscovery eDiscovery Platform and knew or was willfully blind to that result. KLDiscovery publishes documentation and training materials instructing customers and end users to: (i) create a predictive-coding profile and tag seed/target documents (including via random sampling); (ii) run Train & Classify to build a model and assign scores across coded and uncoded documents; (iii) configure and review a Control Set with user-selected confidence and error-margin parameters; and (iv) use the platform's threshold/performance reporting to select a cutoff and mark predicted positives. By providing those instructions and training, KLDiscovery specifically encouraged and led customers and users to practice the accused functionality, including at least claim 1.

59.    After receiving ACT's July 14, 2025 notice letter, KLDiscovery continued to host and circulate the documentation described above and to promote the accused features, demonstrating at least reckless disregard of ACT's patent rights.

60.    Despite having notice of its infringement, KLDiscovery has continued to make, use, test, offer for sale, import, and/or sell the KLDiscovery eDiscovery Platform in a manner that infringes the '374 Patent. KLDiscovery's conduct is willful, and ACT is therefore entitled to enhanced damages under 35 U.S.C. § 284.

61.    As a result of KLDiscovery's infringement of the '374 Patent, ACT has suffered monetary damages and seeks no less than a reasonable royalty for the use made of the invention by KLDiscovery, together with pre- and post-judgment interest and costs as fixed by the Court. See 35 U.S.C. § 284.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff ACT respectfully requests that this Court enter:

1. A judgment in favor of ACT that KLDiscovery has infringed the '374 Patent, either literally or, in the alternative, under the doctrine of equivalents;

2. A judgment that KLDiscovery's infringement of the '374 Patent is willful;

3. An award of damages resulting from KLDiscovery's acts of infringement in accordance

with 35 U.S.C. § 284;

4. A judgment that this case is exceptional under 35 U.S.C. § 285 and awarding ACT its reasonable attorneys' fees, costs, and expenses incurred in this action;

5. A judgment and order requiring KLDiscovery to provide accountings and to pay supplemental damages, including, without limitation, pre-judgment and post-judgment interest; and

6. Any and all other relief to which ACT may be entitled.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), ACT requests a trial by jury of all issues so triable by right.

Dated:  November 7, 2025                  Respectfully Submitted,

                                                 */s/ Bradford J. Black*
                                                 Bradford J. Black
                                                 Texas Bar No. 24086243
                                                 bblack@bradfordblack.com
                                                 **BRADFORD BLACK P.C.**
                                                 500 W. 2nd Street, Suite 1900
                                                 Austin, TX 78701
                                                 Telephone: (415) 813-6211
                                                 Facsimile: (415) 813-6222

                                                 *Attorneys for Plaintiff*
                                                 ADAPTIVE CLASSIFICATION
                                                 TECHNOLOGIES LLC